1
2
3
4
5
6
7
8           **IN THE UNITED STATES DISTRICT COURT**

9           **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   YVONNE LERAMO, M.D.,                    CASE NO. CV F 09-2083 LJO JTL

12             Plaintiff,                    **ORDER ON MOTION TO DISMISS AND
                                             MOTION TO STRIKE** (Doc. 45)
13        vs.

14   PREMIER ANESTHESIA MEDICAL
     GROUP, et. al,
15

16             Defendants.
17   _____/

18                           **INTRODUCTION**

19        Defendants Premier Anesthesia Medical Group ("Premier"), Kamalnath A. Iyer, M.D. ("Dr.

20   Iyer"), Bruce Scurlock, M.D. ("Dr. Scurlock"), and Kail S. Dhaliwal, M.D. ("Dr. Dhaliwal")

21   (collectively "defendants") move for summary adjudication in their favor on the remaining claims of

22   gender, national origin and racial discrimination and retaliation asserted by plaintiff Yvonne Leramo,

23   M.D. ("Dr. Leramo"). Dr. Leramo filed an untimely opposition, which this Court shall consider. The

24   opposition, however, fails to oppose defendants' summary judgment motion meaningfully. To the

25   extent Dr. Leramo opposes this motion, she fails to raise questions of material fact as to her

26   discrimination, retaliation, and Constitutional claims. For the following reasons, this Court GRANTS

27   summary judgment in favor of defendants and against Dr. Leramo on all of Dr. Leramo's remaining

28   claims (first through sixth causes of action).

                                    1

## BACKGROUND

Dr. Leramo is a black Jamaican female licensed medical doctor who worked pursuant to a contract with Premier to provide anesthesia services from August 2002 to August 2008.  Premier is a general partnership comprised of anesthesiologists who practice medicine in Bakersfield, California.  Drs. Iyer, Sculock and Dhaliwal are licensed anesthesiologists who are Premier partners.  In June 2008, Premier refused to renew Dr. Leramo's contract.  The contract terminated 60 days later.

Dr. Leramo proceeds on her first amended complaint.   This Court previously granted defendants' motion to dismiss and strike and dismissed Dr. Leramo's seventh (violation of California Labor Code sections 10540 and 1054) and eighth (defamation) claims.  The remaining claims are:

1.      Race and national origin discrimination in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981");

2.      Retaliation in violation of Section 1981;

3.      Race and sex discrimination in violation of  Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-2. ("Title VII");

4.      Race and sex discrimination in violation of California's Fair Employment and Housing Act, California Government Code §12940 ("FEHA");

5.      Violation of Cal. Civil Code §51.5 ("Unruh Act"); and

6.      Violation of Article 1, § 8 of the California Constitution.

### Defendants' Facts to Support Summary Judgment Motion

Defendants move for summary adjudication as to all of Dr. Leramo's remaining claims.  Defendants' motion is based on the following facts:[1]

### Dr. Leramo's education and prior work experience

Dr. Leramo finished her residency in August 2000.  Dr. Leramo did not enter the work force for 16 months thereafter due to illness.  She was employed at Kern Medical for 11 days in November 2001.  Dr. Leramo found that the busy environment was "too much for" her "at that time."  She "didn't have stamina, she wasn't strong enough to handle the pressure."  Kern Medical advised Dr. Leramo "to go

---

[1]The following facts are undisputed and supported by the evidence submitted by the parties, unless otherwise noted.

back to where [she] was trained at and to do some time." Thus, Dr. Leramo was terminated from Kern Medical after her 11-day tenure.

Dr. Leramo returned to the University of Southern California ("USC") between January 2002 and August 2002 to "refresh [her] skills." The time at USC was for "work hardening to get herself back in the work force." Dr. Leramo sought work with Premier after completion of the USC refresher course.

### "Independent Contractor Agreement"

In July 2002, Dr. Leramo's husband Dr. Olusegun Leramo ("Husband"), a neurosurgeon in Bakersfield, told Dr. Iyer that his wife was an anaesthesiologist who needed work, and asked Premier to give her a chance. As a favor to Husband, Dr. Iyer met with Dr. Leramo to discuss options. In discussing the terms of the agreement, Dr. Leramo and Husband requested Premier not to assign Dr. Leramo to work on surgeries performed by Husband or his partners, so that Husband could "maintain good cordial relations with [his] colleagues in the office." Premier agreed with this condition, and provided for it in the agreement.

The agreement the parties signed was entitled "Independent Contractor Agreement" ("agreement"). The agreement specifically included a line to explain that "no partnership is being offered." Premier characterized the agreement as an offer to Dr. Leramo to work as a part-time independent contractor without the possibility of partnership. Dr. Leramo signed the contract with Premier in August 2002.

The agreement was a one-year contract that automatically renewed each year if the parties did not terminate the arrangement. Dr. Leramo was to work a minimum of three days per week, and she was paid $22.00 per unit until she achieved board certification in anesthesiology. When she passed her board exam in 2004, Dr. Leramo's compensation increased to $25.00 per unit.

Dr. Leramo was paid once per month. No taxes were taken out of her pay by Premier. Dr. Leramo paid her own taxes. In addition, Dr. Leramo paid her own professional liability insurance. She received no other compensation or benefits from Premier. Dr. Leramo took time off for vacation but received no compensation from Premier during those times.

Dr. Leramo could have stopped working for Premier at any time, and she believed she only

3

needed to give 60 days notice.  She was free to provide anesthesia services to other parties while she worked for Premier.

Premier could not assign additional work unless Dr. Leramo wanted the assignments.  Dr. Leramo was free to work more or fewer days, and she needed only to inform Premier how many days she wanted to work.

All independent contractors who work for Premier, including Dr. Leramo, are required to secure privileges to work at each of the hospitals to which Premier provides services.  Premier does not allow any of its partners or contractors to work at a hospital until the doctor has obtained the requisite privileges.  Premier does not provide any of the equipment for its doctors to perform their services at the hospitals. Each of the hospitals provides all necessary equipment to the doctors. None of Premier's partners or contractors is an employee of a hospital.

Dr. Leramo performed services at various hospitals and surgery centers where Premier had a contract.  Like other Premier anaesthesiologists, she was able to select the surgery room in which she would work based on a rotating selection schedule process.  The surgery room selections were made according to a selection number, and selection numbers rotated each week.

In 2004, one of Premier's full-time partners retired.  In addition, Dr. Leramo passed her boards that year.  Premier offered Dr. Leramo the opportunity to work more than three days per week and to take weekend calls.  Dr. Leramo indicated that she wanted to work more hours.

From 2004-2007, Dr. Leramo was assigned calls in either general surgery or labor and delivery.  Premier asserts that it did not control the manner or means by which she performed anaesthesia services.  She exercised her own discretion concerning how she delivered her services based upon her professional judgment.

**Premier Experiences with Dr. Leramo**

Premier anesthesiologists assisted Dr. Leramo on numerous occasions when she had difficulty performing her duties.  Some were called in when Dr. Leramo failed to appear for surgery, though Dr. Leramo was on call during that time and had been called in.  Other times, Premier anesthesiologists were called in to take over and to perform Dr. Leramo's duties, because Dr. Leramo was unable to administer the anaesthesia to the patient.  Premier partners intervened when Dr. Leramo performed

4

intubations, spinal taps, and epidurals, among other procedures.

On June 25, 2005, Dr. De Rouen relieved Dr. Leramo on the obstetrics ("OB") floor at Mercy Southwest Hospital.  He learned that Dr. Leramo caused an emergency c-section (due to a "footlong breach") to be delayed by twelve hours because she was unable to insert the epidural.  Dr. De Rouen observed where Dr. Leramo had made multiple attempts at the epidural placement.  Dr. De Rouen inserted the epidural catheter without difficulty, and administered an epidural blood patch to treat the patient's spinal headache caused by Dr. Leramo's inability to effectuate the epidural correctly.  Dr. De Rouen's opinion was the Dr. Leramo did not provide the necessary care and lacked judgment since she did not contact one of the other on-call anaesthesiologists to assist her.

Dr. Heess assisted Dr. Leramo on at least three occasions when she had difficulty anesthetizing patients.  He noted her problems with intubating children and putting them deep enough under when anesthetizing them.  Dr. Heess and Dr. Wagner assisted her in intubating patients.  When Dr. Heess provided assistance to Dr. Leramo, he observed that Dr. Leramo was panic-stricken and unable to articulate the problems she was experiencing with the procedure.  On another occasion, a nurse requested Dr. Heess to assist Dr. Leramo.  Again, Dr. Leramo was flustered and unable to explain what the problem was.  Dr. Heess' opinion was that Dr. Leramo's skills were lacking significantly.

### Outside Complaints about Dr. Leramo's Performance

Beginning in 2005 and continuing through 2008, Premier received numerous complaints from surgeons that Dr. Leramo's skills were lacking.

In 2005, after Dr. Leramo increased her hours and began accepting weekend call assignments, Premier heard complaints from surgeons and hospital staff about Dr. Leramo.  The complaints included problems with Dr. Leramo's ability to administer epidurals and secure airways and her failure to show up on time when on call.  Drs. Iyer and Scurlock were responsible for responding to complaints about Premier's doctors, and both attended hospital Peer Review Committee Meetings.  Over the years, Dr. Leramo's name frequently came up in these meetings based on complaints filed by physicians and nurses about her performance and timeliness.  Drs. Iyer and Scurlock defended Dr. Leramo on these occasions, even if she had been at fault.

During this time period, particularly in 2007 and 2008, the following doctors informed Premier

that they would not work with Dr. Leramo, because they found her professional skills lacking and were concerned for the safety and comfort of their patients: (1) Dr. Amirpour; (2) Dr. Soto; (3) Dr. Rivera; (4) Dr. Lopez; (5) Dr. Tivnon; (6) Dr. Wrobel; (7) Dr. Peck; (8) Dr. Paw; (9) Dr. Srour; (10) Dr. Hamilton; (11) Dr. Alexandrakis; (12) Dr. Berjis; (13) Dr. Dev; and (14) Dr. Rabinov.  In addition to the fourteen doctors who refused to work with Dr. Leramo, additional doctors indicated to Premier that they would only work with Dr. Leramo on simple, non-complicated cases.  Those doctors include: (1) Dr. Schamblin; (2) Dr. Enriquez; (3) Dr. Miro; (4) Dr. Bui; and (5) Dr. Stone.

**Efforts to Address Complaints**

Due to the escalating complaints about Dr. Leramo (particularly in obstetrics), Dr. Iyer developed a presentation for the entire Premier group to attend on Epidural Anesthesia.  Dr. Iyer presented the presentation in February 2006.  Dr. Iyer offered the presentation to all members of the group in an effort not to "single out" or embarrass Dr. Leramo.  Dr. Leramo attended the presentation.

In January 2007, an emergency meeting of the Premier partners was called.  Dr. Iyer informed the group that Dr. Leramo continued to have significant problems with Labor and Deliver epidurals despite efforts to assist her to improve her skills.  In a three-year period of time, Dr. Leramo had more than twenty-four "wet taps,"[2] which is considerably above average.  The Premier partners at the meeting decided to encourage Dr. Leramo to take a one-year fellowships in OB anaesthesiology to improve her skills.  This recommendation for further education  was made because the hospitals Premier contracts with are not teaching hospitals and anesthesiologists were expected to be able to perform epidurals without appreciable difficulty.

Dr. Iyer spoke to Dr. Leramo on more than one occasion about a fellowship due to her problems with performing epidurals and spinal taps.  Although Dr. Leramo admits to having difficulty with OB epidurals, she chose not to accept the offer to pursue a fellowship.

On March 6, 2007, a second emergency meeting of the Premier partners took place.  Dr. Iyer

---

[2] A wet tap is a complication from administering an epidural block.  It results from an epidural needle that punctures the dura, making a hole.  The puncture cases cerebrospinal fluid to leak from the hole.  The leak causes a post-dural puncture headache, or "spinal headache," that can last up to a few weeks.  To relieve the spinal headache, anesthesiologists may administer an epidural blood patch, in which blood is drawn from the patient's arm and injected into the epidural space.  The blood clots and seals the hold made in the dura, relieving the headache.

1   reported that Dr. Leramo was not interested in pursuing a fellowship.  At this meeting, the group

2   unanimously agreed to take Dr. Leramo off the OB call schedule.  Dr. Iyer convinced the group to allow

3   Dr. Leramo to return to her previous schedule pursuant to the contract, and she would be allowed one

4   call per week.

5                          **Scheduling Challenges**

6        Dr. Leramo was taken off of OB calls in March 2007.  Because roughly twenty surgeons

7   informed Premier that they did not want Dr. Leramo to provide anesthesia services for their patients,

8   however, Premier was challenged to staff surgeries.  Premier tried to arrange a schedule so that Dr.

9   Leramo did not work for the surgeons to accommodate their requests, but occasionally Premier was

10   unable to manipulate the schedule to satisfy the surgeons and Dr. Leramo's selected surgery rooms.

11   Taking Dr. Leramo off the OB calls caused a significant burden to Premier, because Labor and Deliver

12   requires more around-the-clock hours.

13                           **Partnership**

14        In the Fall of 2007, Dr. Leramo expressed to Premier her desire to become a Premier partner.

15   The partnership held a meeting and voted unanimously that Dr. Leramo would not receive an offer of

16   partnership.  In December 2007, Dr. Scurlock and Dr. Iyer held a meeting with Dr. Leramo to discuss

17   her request.  Dr. Scurlock advised Dr. Leramo that since her contract did not provide for partnership,

18   she had not been made partner.  He further advised that Premier did not intend to negotiate a partnership

19   agreement with Dr. Leramo, considering the mounting complaints from surgeons and physicians about

20   her skills and her untimeliness.  He further expressed that, because of the number of doctors who

21   refused to work with her, Premier was experiencing difficulty with manipulating the schedule to

22   accommodate her and the surgeons' requests.

23            **Continued Complaints and Decision to Terminate**

24        Although she was removed from the weekend on call schedule and the OB calls, complaints

25   about Dr. Leramo continued to be made between April 2007 and June 2008.  These complaints came

26   from surgeons and physicians unrelated to OB calls.  Because of the difficulties with staffing, Dr.

27   Leramo's failure to improve her skills over the years, failure to address her tardiness, and other issues,

28   Premier decided it was time to end its relationship with Dr. Leramo.  Premier gave 60 day notice to Dr.

1 Leramo, and the contract terminated in August 2008.

2 **Dr. Leramo's Facts To Oppose Motion**

3 Dr. Leramo maintains that she was an employee with Premier who was discriminated against

4 and retaliated against based on her race, national origin, and gender, among other reasons.  Dr. Leramo

5 provided the following additional facts to support her claims:

6 **Employment Relationship**

7 Dr. Leramo describes an occasion where she asked Dr. Scurlock whether she could take one day

8 off and Dr. Scurlock refused.  She believed that she had to ask permission to take the day off rather than

9 ask someone else to cover for her.  She believed she "did the right thing" by asking for the day off, and

10 asking the scheduling partner to rearrange the schedule, rather than asking someone else to cover for

11 her.  Based on Dr. Scurlock's refusal, Dr. Leramo stayed and worked that day.

12 **Dr. Leramo's Allegations of Discrimination**[3]

13 According to Dr. Leramo's testimony, the alleged conduct of discrimination was based on her

14 race, national origin, and gender, sometimes without distinction.  Dr. Leramo's discrimination claims

15 are based on the following allegations:

16     1.    Unnamed "doctors, nurses, and scheduling clerks" spoke to her in a "rude manner,"

17         were "condescending," and were "not friendly";

18     2.    On one occasion, Dr. Leramo was assigned to finish a case for Dr. Scurlock.  Dr.

19         Scurlock told the patient that while the patient was anesthetized, Dr. Scurlock was going

20         to "metamorph" from a white man to a black female, referring to Dr. Leramo.  Dr.

21         Leramo said, "Okay, I'm going to start the case, but she is going to take over, so I'm

22         goint to–a white male is going to metamorph into a Black female."  Dr. Leramo

23         considered the comment to be "unethical and unprofessional";

24     3.    Dr. Leramo claims she was discriminated against because while she worked at Premier,

25         Dr. Scurlock went to Jamaica but did not ask her any questions about the country before

26         he went and did not discuss the trip with her when he returned;

27

28 [3] These acts are set forth in the complaint and by defendants.  As discussed more fully below, Dr. Leramo does not specify these acts in the opposition papers.

8

4.  In reference to an alleged altercation between Dr. Iyer and an African-American Premier anesthesiologist, Dr. Leramo testified that Dr. Iyer told her: "If you are Black, you should not be shouting at people." Dr. Leramo testified that Dr. Iyer did not explain the comment. Dr. Iyer denies making the statement;

5.  Dr. Leramo bases her gender discrimination claim on her belief that men "got away with a lot more" than she did within Premier. According to Dr. Leramo, it was "okay" for the male doctors to be late but not the female doctors. Dr. Leramo could not think of other examples; and

6.  Dr. Leramo contends that she was made to feel that she did not measure up and that the Premier doctors made her feel as if she did not know anything about her profession. If she answered a question correctly, Premier partners would ask if she learned that in class.

**Dr. Leramo's Retaliation Claim**

Dr. Leramo's retaliation claim is based on the following:

In 2007, at Memorial Hospital, the doctors' refrigerator was located in the men's changing room. Female doctors were required to knock on the men's changing room door and seek permission to enter to retrieve their food or drinks in the refrigerator. On one occasion, Dr. Leramo knocked on the men's dressing room door. Dr. Wagner answered the door and said, "Come in if you want to get raped." Dr. Leramo and Husband complained to Dr. Iyer about the comment.

Husband called Dr. Wagner and demanded an apology for making the comment to Dr. Leramo. At first, Dr. Wagner refused. Later, Dr. Wagner called to apologize, though the apology was reluctant. Dr. Wagner later apologized to Dr. Leramo, but she thought the apology was insincere. Aside from Dr. Iyer telling Dr. Wagner to apologize, no other action was taken against Dr. Wagner. The refrigerator was removed from the men's changing room the next day and placed in a neutral location.

Dr. Leramo argues that Premier reduced her hours, and removed her from OB calls shortly after this incident and as a result of this incident. Dr. Leramo contends that the reduction of hours was based on her complaint as well as "the fact that my husband is Black and my husband shouted at him, because, according to Dr. Iyer, if you are Black you should not be shouting at people."

9

1                                        **STANDARD OF REVIEW**

2          On summary judgment, a court must decide whether there is a "genuine issue as to any material

3  fact." Fed. R. Civ. P. 56(c); *see also, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  A party

4  seeking summary judgment bears the initial burden of establishing the absence of a genuine issue of

5  material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party may satisfy

6  this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving

7  party's case; or (2) by demonstrating that the nonmoving party failed to make a showing of sufficient

8  evidence to establish an essential element of the nonmoving party's claim, and on which the non-

9  moving party bears the burden of proof at trial.  *Id.* at 322.  "The judgment sought should be rendered

10  if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no

11  genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."

12  Fed. R. Civ. P. 56(c).  "If the party moving for summary judgment meets its initial burden of identifying

13  for the court those portions of the material on file that it believes demonstrates the absence of any

14  genuine issues of material fact," the burden of production shifts and the nonmoving party must set forth

15  "specific facts showing that there is a genuine issue for trial."  *T.W. Elec. Serv., Inc. v. Pacific Elec.*

16  *Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quoting Fed. R. Civ. P. 56(e)).

17          To establish the existence of a factual dispute, the opposing party need not establish a material

18  issue of fact conclusively in its favor, but "must do more than simply show that there is some

19  metaphysical doubt as to the material facts."  *Matsushita Elec. Indust. Co. V. Zenith Radio Corp*, 475

20  U.S. 574, 587 (1986).  It is sufficient that "the claimed factual dispute be shown to require a jury or

21  judge to resolve the parties' differing versions of the truth at trial."  *First National Bank of Arizona v.*

22  *Cities Serv. Co*., 391 U.S. 253, 290 (1968).  The nonmoving party must "go beyond the pleadings and

23  by her own affidavits, or by depositions, answer to interrogatories, and admissions on file, designate

24  specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324.  Fed. R. Civ. P.

25  56(e) requires a party opposing summary judgment to "set out specific facts showing that there is a

26  genuine issue for trial."  "In the absence of specific facts, as opposed to allegations, showing the

27  existence of a genuine issue for trial, a properly supported summary judgment motion will be granted."

28  *Nilsson, Robbins, et al. v. Louisiana Hydrolec*, 854 F.2d 1538, 1545 (9th Cir. 1988).

1

**D**ISCUSSION

**Dr. Leramo's Opposition and "Disputed" Facts**

2

3      As an initial matter, this Court must address Dr. Leramo's opposition and disputed facts.

4      In this motion for summary judgment, defendants raise twenty-three separate grounds for which

5 they assert they are entitled to judgment as a matter of law.  As discussed more fully below, many of

6 these issues are supported by law and fact, identified in the legal memorandum and the separate

7 statement of undisputed facts, and supported by the exhibits attached thereto.

8      Dr. Leramo opposes this motion in an 8-page opposition.  The opposition is in outline form

9 (rather than prose).  With few exceptions, this outline-like opposition contains nothing more than

10 paragraphs from cases that appear to have been copied and pasted into the memorandum. The  case

11 citations are unclear and most do not conform to any style manual of citation with which this Court is

12 familiar.  In those few exceptions in which Dr. Leramo's opposition cites evidence, Dr. Leramo makes

13 a conclusory legal conclusion or factual determination in a bulleted point, followed by reference to the

14 paragraph number contained in the statement of undisputed facts.  The opposition contains no legal

15 analysis, i.e., no application of the facts to applicable legal authorities.

16      Additionally, the opposition ignores most of the arguments raised in defendants' motion.  Dr.

17 Leramo's opposition focuses almost exclusively on the issue of whether Dr. Leramo was an

18 independent contractor or employee.  Dr. Leramo appears to dispute only: (1) whether Dr. Leramo was

19 an independent contractor; (2) whether Dr. Leramo performed adequately; and (3) material facts related

20 to her retaliation claim.  All other arguments raised by defendants are unopposed.

21      For those arguments that are unopposed, this Court applies a different standard of review.  When

22 a summary judgment motion is unopposed, a court must "determine whether summary judgment is

23 appropriate – that is, whether the moving party has shown itself to be entitled to judgment as a matter

24 of law." *Anchorage Associates v. V.I. Bd. of Tax Review*, 922 F.2d 168, 175 (3rd Cir. 1990).  A court

25 "cannot base the entry of summary judgment on the mere fact that the motion is unopposed, but, rather

26 must consider the merits of the motion."  *United States v. One Piece of Real Property, etc.*, 363 F.3d

27 1099, 1101 (11th Cir. 2004).  A court "need not sua sponte review all of the evidentiary materials on

28 file at the time the motion is granted, but must ensure that the motion itself is supported by evidentiary

11

1   materials." *One Piece of Real Property*, 363 F.3d at 1101.

2        For those arguments addressed by Dr. Leramo, the "dispute" of defendants' facts is puzzling

3   and fails to raise serious questions of disputed fact. For example, defendants set forth as undisputed

4   fact #1: "Plaintiff Dr. Yvonne Leramo is a licenced medical doctor who is eligible to practice in the

5   State of California. Plaintiff has not lost her license, or ability to practice medicine, and she has not had

6   any hospital privileges revoked." In response, Dr. Leramo "disputes" this fact with the following: "Dr.

7   Leramo was hired as an employee." The response is irrelevant to the asserted fact. In another example,

8   defendants asserted: "In 2004, one of Premier's full-time partners retired, and plaintiff had an

9   opportunity to take on more hours, which she accepted. Premier offered her the opportunity to work

10  more than three days per week and take weekend calls, and she indicated that she wanted to work more

11  hours." Dr. Leramo "disputes" this fact with the following: "Dr. Leramo passed her board exam on the

12  first try and was considered a good employee for Premier." Again, this information does not dispute

13  the asserted fact. Dr. Leramo "disputes" nearly 35 separate asserted facts by defendant with a simple

14  reference to paragraph 27. In response to paragraph 27, Dr. Leramo asserts: (a) Premier has no way of

15  documenting complaints; and (b) Premier has not produced any written complaints from a hospital or

16  physician from the time these incidents occurred. The citations to support these statements either are

17  not included in the excerpts or do not support the statements asserted. In addition, these statements are

18  irrelevant to, and fail to raise a material issue of fact regarding, the 35 asserted facts they purport to

19  dispute.

20       Dr. Leramo's opposition and statement of disputed facts fail to carry her burden to oppose this

21  motion. To oppose a summary judgment motion meaningfully, the nonmoving party must set forth

22  "specific facts showing that there is a genuine issue for trial." *T.W. Elec. Serv.,* 809 F.2d at 630. The

23  district court may limit its review to the documents submitted for the purpose of summary judgment

24  and those parts of the record specifically references therein. *Id.* The Court is not obliged "to scour the

25  record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir.1996).

26  The Court cannot take on the role of advocate to protect the non-moving party's interest in opposing

27  this motion. Accordingly, this Court limits its review to the parts of the record specifically referenced

28  by Dr. Leramo, supported by the evidence, and analyzed appropriated according to applicable law.

**Whether Dr. Leramo was an Employee or Independent Contractor**

Defendants assert that Dr. Leramo's discrimination claims fail because she was not an employee of Premier. Title VII, FEHA and California Constitution Art. 1, § 8 protect employees, but do not protect independent contractors. *See Adcock v. Chrysler Corp.*, 166 F.3d 1290, 1292 (9th Cir. 1999); Cal. Gov. Code §12940(a); *see also*, *Sistare-Meyer v. Young Men's Christian Assoc.*, 58 Cal. App. 4th 10, 16-17 (1997) (wrongful termination based on race and sex discrimination pursuant to Cal. Const., Art. 1., § 8 does not apply to independent contractors). Accordingly, to prevail on her third, fourth and sixth causes of action, Dr. Leramo must establish that she was an employee of Premier.

To determine whether Dr. Leramo was an employee or independent contractor for Title VII claims, the Court evaluates "the hiring party's right to control the manner and means by which the product is accomplished" by using a number of factors. *Murray v. Principal Fin. Group, Inc.*, 613 F.3d 943, 945 (9th Cir. 2010) (quoting *Nationwide Mutual Insurance Co. v. Darden*, 503 U.S. 318, 112 S. Ct. 1344, 117 L. Ed. 2d 581 (1992)) ("*Darden*"). The relevant factors of the *Darden* test are:

> [1] the skill required; [2] the source of the instrumentalities and tools; [3] the location of the work; [4] the duration of the relationship between the parties; [5] whether the hiring party has the right to assign additional projects to the hired party; [6] the extent of the hired party's discretion over when and how long to work; [7] the method of payment; [8] the hired party's role in hiring and paying assistants; [9] whether the work is part of the regular business of the hiring party; [10] whether the hiring party is in business; [11] the provision of employee benefits; and [12] the tax treatment of the hired party.

*Murray*, 613 F.3d at 945-46; *Darden*, 503 U.S. at 323.

Defendants contend that the undisputed facts establish that Dr. Leramo was an independent contractor. The following facts are undisputed: Dr. Leramo worked with Premier pursuant to a contract entitled "Independent Contractor Agreement." Dr. Leramo is a licenced medical doctor who was required to possess the licences and skills to perform anesthesia services. She was required to pay her own employment taxes and malpractice insurance. She received no paid benefits from Premier. The hospital, not Premier, provided the equipment for Dr. Leramo to perform her anesthesia services. Under the rotating system, Dr. Leramo and other Premier doctors selected the surgery rooms in which they wanted to work. Dr. Leramo exercised her own discretion when determining the manner in which she administered anesthesia. Both parties agreed that she would work a minimum of three days a week,

13

but that she could take additional work if she desired. Both parties agreed that Dr. Leramo would not work on neurosurgery cases that were performed by Husband or his colleagues. Dr. Leramo's contract with Premier was not exclusive, and she was free to work at other hospitals.

Defendants set forth multiple cases in which, under similar circumstances and applying the *Darden* factors, an anaesthesiologist was found to be an independent contractor as a matter of law. For example, in *Vakharia, M.D. v. Swedish Covenant Hospital*, 190 F.3d 799 (7th Cir. 1999), an anesthesiologist was found to be an independent contractor because she provided services pursuant to an independent contractor agreement, she was "self-employed for tax purposes, she paid her own malpractice insurance and [] she received no benefits from [the defendant]." *Id.* at 804 (affirming summary judgment on issue to bar Title VII claim). Similarly, in *Alexander v. Rush North Shore Med. Ctr.*, 101 F.3d 487 (7th Cir. 1996), the court affirmed summary judgment that an anaesthesiologist who paid his own malpractice insurance, had specialized skill, did not receive benefits, was free to work with other hospitals, and exercised his own judgment when delivering services to his patients was an independent contractor. *Id.* at 806. *See also, Cileck v. Inova Health Sys. Servs.*, 115 F.3d 256, 260 (4th Cir. 1997) (emergency room doctor independent contractor because the independent contractor relationship was established from the beginning, doctor could work at other medical facilities, he was paid for work performed, not salary, hospital paid no benefits, and no employment taxes were withheld).

The reasoning of these cases is persuasive, particularly where the facts of these legal authorities are so similar to those of the instant action. Dr. Leramo entered into an Independent Contractor Agreement, paid her own employment taxes and malpractice insurance, selected the surgery rooms in which she would work, was highly skilled and licenced, controlled how she performed her services, and was paid no employment benefits. Under these circumstances, and based on the reasons expressed in the above-cited legal authorities, Dr. Leramo was an independent contractor for purposes of her Title VII claim. Accordingly, summary adjudication on Dr. Leramo's Title VII claim is granted in favor of defendants.

While defendants make no distinction, the Court notes that these cases apply only to Title VII claims. While Section 1981 prohibits discrimination on grounds of race in making and enforcing

14

1   contracts, it does not require an employee relationship.  As to Dr. Leramo's California claims (FEHA

2   and Cal. Constitution Art. 1, § 8), defendants fail to establish that this Court can determine the

3   employment relationship as a matter of law.  Indeed, California law presumes an employment

4   relationship if services were performed and under these circumstances, a fact-finder would be required

5   to determine the relationship.  Accordingly, summary adjudication is denied as to the California law

6   claims, because the employment relationship cannot be determined as a matter of law under the

7   circumstances and facts presented.

8                    **Dr. Leramo's Claims Against Individual Defendants**

9           Defendants argue that Dr. Leramo's discrimination claims against the individual defendants fail

10  as a matter of law because individuals are not liable for discrimination or retaliation.  To support this

11  statement, defendants largely argue that supervisors are not liable for employment discrimination under

12  FEHA.  Dr. Leramo argues, however, that under California law, partners in a partnership are jointly and

13  severally liable to partnership creditors and for the tortious conduct of their co-partners.

14          To the extent that Dr. Leramo asserts claims against the individual defendants as supervisors

15  for her discrimination claims, defendants have established that these claims fail as a matter of law.  Dr.

16  Leramo does not challenge defendants' assertion that individual claims against a supervisor are barred.

17  This Court agrees that the employer, rather than the supervisors, are liable for discrimination claims.

18  *See Reno v. Baird*, 18 Cal. 4th 640, 645, 46 (1998) (only an employer may be liable for discrimination,

19  but individuals may be held liability under FEHA for harassment).  Accordingly, summary adjudication

20  in defendants' favor is granted on this issue.

21          As to whether the individual defendants are liable as partners of Premier, defendants have failed

22  to carry their initial burden to establish that Dr. Leramo's claims against the individual defendants fail

23  as a matter of law.  In their motion, defendants note that partners of a general partnership cannot be held

24  individually liable in the context of employment discrimination in a parenthetical to a string-cited

25  citation.  The case cited for this position is *Parsells v. Manhattan Radiology Group, LLP*, 255 F.Supp.

26  2d 1217, 1235 n.7 (D. Kan. 2003).  In reply, defendants again rely on this case to argue that the court

27  "rejected" the position that partners may be liable personally because there is "no authority" for this

28  position.  Defendants overstate the ruling in *Parsells*.  In a footnote, that court rejected plaintiff's bald-

1   faced assertion because plaintiffs provided no authority to support it.  Moreover, the *Parsells* court

2   applied Kansas law, not California law.  For these reasons, this Court finds *Parsells* to be unpersuasive

3   and inapplicable authority for the position asserted.  Accordingly, defendants have failed to establish

4   that the individual defendants who are partners of Premier are not liable individually for Dr. Leramo's

5   claims, and summary adjudication on this issue is denied.

6   **Federal and State Discrimination Standards**

7           Dr. Leramo asserts multiple federal and state discrimination claims pursuant to Section 1981,

8   Title VII, [4] and FEHA.  Section 1981, Title VII and FEHA prohibit discrimination against individuals

9   in the workplace on the basis of race, and Title VII and FEHA prohibit discrimination on the basis of

10  race, national origin and gender.  Section 1981; 42 U.S.C. §2000e-2; Cal. Gov. Code §§12940(a)-(d).

11  In addition, both federal and California courts analyze indirect or circumstantial discrimination claims

12  under the shifting burden of proof framework developed in *McDonnell Douglas Corp. v. Green*, 411

13  U.S. 792, 93 S.Ct. 1817 (1973) and reaffirmed in *St Mary's Honor Center v. Hicks & Co.*, 509 U.S.

14  502, 113 S.Ct. 2742 (1993).  *See Caldwell v. Paramount Uni. Sch. Distr.*, 41 Cal. App. 4th 189, 200

15  (1995) (applying a *McDonnell Douglas* analysis to discrimination under California's FEHA); *Mixon*

16  *v. Fair Employment and Housing Comm'n.*, 192 Cal. App. 3d 1306, 1316 (1987) ("While the California

17  act and Title VII differ in some particulars, their objectives are identical, and California courts have

18  relied upon federal law to interpret analogous provisions of the state statute."); *Manatt v. Bank of*

19  *America*, 339 F.3d 792 (9th Cir. 2003) (the court evaluates 42 U.S.C. §1981 claims the same as Title

20  VII claims).

21          Under the burden-shifting framework of Title VII and FEHA, Dr. Leramo must establish a prima

22  facie case of discrimination in the workplace by demonstrating that she: (1) was a member of a

23  protected class; (2) performed her job in a competent manner; (3) suffered an adverse employment

24  action; and (4) the action occurred under circumstances suggesting discriminatory motive (i.e. person

25  outside of the protected class was treated more favorably). *McDonnell Douglas*, 411 U.S. at 802; *Nidds*

26  *v. Schindler Elevator Corp.*, 113 F.3d 912, 917 (9th Cir. 1996), *cert. denied*, 118 S.Ct. 369 (1997);

27

28          [4]Although the Court found that for purposes of Title VII, Dr. Leramo was an independent contractor, the Court
considers the Title VII claim analysis in the alternative.

16

*Caldwell*, 41 Cal. App. 4th at 200; *Mixon*, 192 Cal. App. 3d at 1319 (applying *McDonnell Douglas* factors).

If Dr. Leramo establishes her prima facie case, the burden shifts to Premier to rebut the presumption of discrimination. *McDonnell Douglas*, 411 U.S. at 802.   Premier may rebut the presumption by producing evidence of a legitimate, non-discriminatory reason for its actions. *Id.*; *Nidds*, 113 F.3d at 917.   This burden of production is less than the burden of proving the absence of a discriminatory motive, since the burden of proving the cases rests with Dr. Leramo. *Nidds*, 113 F.3d at 916-17; *Clark v. Claremont University Center*, 6 Cal. App. 4th 639, 663-64 (1992).

If Premier meets its burden, the presumption of discrimination raised by the prima facie case "simply drops out of the picture." *St. Mary's*, 113 S.Ct. at 2747.   The burden shifts back to Dr. Leramo to establish that Premier's stated reasons for the adverse employment action was pretext for unlawful discrimination. *Id.*; *Bradley v. Harcourt, Brace, and Co.*, 104 F.3d 267, 270 (1996).   Dr. Leramo must provide "specific, substantial evidence" that the reasons given were a pretext for discrimination. *Bradley*, 104 F.3d at 270.   Dr. Leramo may establish pretext if there is an absence of documentation confirming the employer's employment decisions. *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1123 (9th Cir. 2004).   In addition, Dr. Leramo must provide evidence that her protected class "actually played a role" and "had a determinative influence" on his demotion. *Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993); *Mixon*, 192 Cal. App. 3d at 1317 (plaintiff must prove that there was a "causal connection" between the protected status and the adverse employment decision).   Ultimately, at this stage, the "factfinder must decide upon all of the evidence before it whether defendant intentionally discriminated against plaintiff." *Mixon*, 192 Cal. App. 3d at 1319 (citing *U.S. Postal Service Bd. of Govs. v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478 (1983)).   "In short the trier of fact decides whether it believes the employer's explanation of its actions or the employee's." *Id*.

"A defendant employer's motion for summary judgment slightly modifies the order of these [*McDonnell Douglas*] showings." *Aguilar v. Atlantic Richfield*, 25 Cal. 4th 826, 850 (2001).   In this motion, defendants bear "the initial burden to either (1) negate an essential element of plaintiff's prima facie case or (2) establish a legitimate, nondiscriminatory reason for terminating plaintiff." *Scotch v. Art Institute of Cal.*, 173 Cal. App. 4th 989,1005 (2009).   "To avoid summary judgment [once the

17

employer makes the foregoing showing], an employee claiming discrimination must offer substantial evidence that the employer's stated nondiscriminatory reason for the adverse action was untrue or pretextual, or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination." *Hersant v. Dept. of Social Servs.*, 57 Cal. App. 4th 994, 1004-05 (1997).

**Dr. Leramo's Discrimination Claims**[5]

Defendants argue that Dr. Leramo cannot establish a prima facie case on her discrimination claims. Dr. Leramo undisputedly is a member of a protected class under the definitions of race, national origin, and gender. Moreover, defendants do not dispute that Dr. Leramo may raise an issue of material fact as to whether an adverse employment action was taken against her for purposes of this motion. To establish this element, Dr. Leramo must show a "materially adverse change in the terms or conditions of employment because of the employer's actions." *Michael v. Caterpillar Fin'l Servs. Corp.*, 496 F.3d 584, 593 (6th Cir. 2007). Defendants argue that Dr. Leramo cannot establish a prima facie case of discrimination because she did not perform in a competent manner, there is no evidence to support a discriminatory motive, and they had a legitimate, non-discriminatory purpose for the adverse employment action. This Court considers each argument below.

**Competent Performance of Duties**

Defendants argue that there is ample undisputed evidence to support their position that Dr. Leramo was not performing her duties as an anaesthesiologist in a satisfactory manner. Defendants provide declarations from the following surgeons: Dr. Rivera, Dr. Lopez, Dr. Berjis, Dr. Heess, Dr. Iyer, and Dr. De Rouen. Each of these surgeons confirms that he or she was not satisfied with Dr. Leramo's ability and skill to perform anaesthesiology services, and told Premier that he or she did not want Dr. Leramo to take calls or assignment for any of his or her cases because of a serious concern for the safety of his or her patients. Dr. Leramo does not dispute these surgeons' statements.

Premier establishes undisputed evidence that approximately twenty surgeons refused to work with Dr. Leramo based on their concern for the safety of their patients and because of their serious

---

[5]The Court considers these arguments as they pertain to the analysis of each of the discrimination claims.

concern regarding her performance and skill.  Fourteen surgeons complained about Dr. Leramo's performance of her services and requested that she not be assigned to their surgeries.  Five additional surgeons advised Premier that they would only allow Dr. Leramo to work on simple, non-complicated cases.  Dr. Leramo admits that she knew that some doctors complained about her, and that she was unable to sign up for some surgery rooms, but claims that she did not know the extent of the complaints against her.  Her lack of knowledge about these complaints does not dispute meaningfully these complaints and the widespread concern among surgeons regarding her ability.  She further admits that she was aware of some complaints, but opines that those complaints are meritless or discriminatory.

The undisputed evidence establishes that Premier anaesthesiologists were required to assist Dr. Leramo when she had difficulty providing anesthesia to patients.  The undisputed evidence establishes that Dr. Leramo performed 24 "wet taps" over a 3 year period of time and that she has particular trouble in OB anesthesiology.  Dr. Leramo admits that she has trouble performing epidurals, and claims that she was unable to perform them in Bakersfield because she was trained in Los Angeles and people in Bakersfield, particularly pregnant people are "plumpier" than people in Los Angeles, making it more difficult to find the spine.  She also admitted that she became too emotional in OB anaesthesiology and she needed a calmer environment to work.

It is undisputed that Premier spoke to Dr. Leramo about improving her skills and suggested that she take time off to improve them by continuing her education.  Dr. Leramo admits that Dr. Iyer spoke to her on more than one occasion about going back to school.  Dr. Leramo further admits that she did not pursue this offer.

It is further undisputed that Dr. Leramo was involved in serious issues with some patients, including one emergency c-section.  Dr. Leramo admits that she does not consider c-sections to be "emergencies."  This bolsters the numerous reports that Dr. Leramo consistently failed to appear to emergency c-sections in a timely manner, if at all.

Dr. Leramo argues that she performed in a competent manner.  She offers enumerated reasons to support her position.  The Court lists these reasons and responses thereto below:

1.      Dr. Leramo passed her board certification exams on the first time.  This is disputed and does not dispute materially the complaints by the twenty surgeons who were concerned

for the safety of their patients and who opined that Dr. Leramo's skills were inadequate.

2. Husband, who uses Premier anaesthesiologists had more severe complaints about Premier partners, including Dr. Scurlock. This is irrelevant to whether Dr. Leramo performed her services competently.

3. Premier has no way of documenting complaints about Dr. Leramo or any other employee. Premier does not keep complaint records to prevent a paper trial in case of a malpractice claim. This does not dispute the complaints about Dr. Leramo's inadequate skills.

4. Premier has no written complaints from hospitals and did not discharge Dr. Leramo for cause after 7 years of service. As to the written complaints, defendants established that they were the property of the hospitals and were in the hospitals' possession. It is undisputed that Dr. Leramo was not discharged for cause.

5. California law requires notification to the appropriate agency of complaints involving patient safety. Defendants made no such reports about Dr. Leramo, even though they claim her practice was substandard and put patients at risk for seven years. This is undisputed.

6. One Premier partner gave Dr. Leramo a positive recommendation. The fact that this partner gave Dr. Leramo is undisputed. However, it is further undisputed that the partner later asked Dr. Leramo to return the recommendation and no longer holds this positive position.

Dr. Leramo's opposition can be summed as follows: She performed her services adequately because (1) she passed her exam on the first try; (2) Premier never reported her to the authorities for her substandard performance; and (3) Premier failed to fire her for cause.

While Dr. Leramo fails to dispute the multiple opinions regarding her skills, she raises a question of fact as to whether she performed adequately. While those surgeons may have considered that she performed below their standards, a fact-finder may conclude, based on the length of her term, her exam performance and skills, and other evidence in the record, that Dr. Leramo performed in a competent manner. This Court cannot determine this issue as a matter of law.

**Discriminatory Motive**

Dr. Leramo also raises a question of fact as to discriminatory motive by presenting evidence that "others not in [her] protected class were treated more favorably." *Washington v. Garrett*, 10 F.3d 1421, 1434 (9th Cir. 1993). As set forth above, Dr. Leramo presents evidence that another anaesthesiologist (Dr. Shenouda) who was not a female black or from Jamaica was promoted to partner after passing the board examination, whereas Dr. Leramo was not. Dr. Leramo also points to the racial comments made at work, the rape comment, and the fact that she was the only person whose contract provided that it was not a partnership offer. Defendants dispute Dr. Leramo's evidence; however, in a summary judgment motion for discrimination, the Court must evaluate the facts in a light most favorable to the plaintiff and must resolve factual disputes in favor of the non-moving party. *Chuang v. University of California Davis, Bd. of Trustees*, 225 F.3d 1115, 1124 (9th Cir. 2000). Based on the evidence presented, and considering the evidence in the light most favorable to Dr. Leramo, she establishes that others not in her protected class were treated more favorably.

**Defendants' Non-Discriminatory Reasons for Action**

Because Dr. Leramo's prima facie case does not fail as a matter of law, the burden shifts now shifts to defendants to rebut the presumption of discrimination. *McDonnell Douglas*, 411 U.S. at 802.

Defendants satisfy their burden to rebut the presumption. Having considered the parties' arguments, the evidence submitted, and the relevant case law, this Court finds that defendants satisfy their burden to establish a legitimate, nondiscriminatory reason for not offering partnership to Dr. Leramo and refusing to renew her contract. *See Scotch*, 173 Cal. App. 4th at 1005. Defendants present evidence that these employment actions were based on legitimate employment concerns; namely, the increasing number of complaints against Dr. Leramo and her services, the increasing number of surgeons who refused to work with Dr. Leramo, the difficulty in staffing Dr. Leramo and other Premier doctors because of the aforementioned refusals, Dr. Leramo's refusal to accept the offered continuing education, Dr. Leramo's inability to improve her skills after years of practice and help offered by Premier partners. Dr. Leramo's contract was not renewed after she was given opportunities to improve yet failed to accept the opportunities and failed to improve. Accordingly, defendants carry their burden to establish that Dr. Leramo's adverse employment actions were based on legitimate business purposes

1  based on her poor performance, which made scheduling difficult, her failure to improve or take steps

2  to improve, and the increased risk she presented to Premier.

3  **Plaintiffs' Argument of Pretext**

4  Because defendants rebutted the presumption of discrimination, the burden shifts back to Dr.

5  Leramo to establish that defendants' stated reasons for the adverse employment actions were pretextual

6  for unlawful discrimination. *Bradley*, 104 F.3d at 270.  Dr. Leramo may establish "pretext in two ways:

7  (1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because

8  it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful

9  discrimination more likely motivated the employer." *Chuang*, 225 F.3d at 1127 (citing *Godwin v. Hung*

10  *Wesson, Inc.*, 150 F.3d 1217,1220-21 (9th Cir. 1998)).  Dr. Leramo must provide "specific, substantial

11  evidence" that the reasons given were a pretext for discrimination. *Bradley*, 104 F.3d at 270.   In

12  addition, Dr. Leramo must establish that there was a causal connection between her protected status and

13  the adverse employment action. *Mixon*, 192 Cal. App. 3d at 1317.

14  At this stage, Dr. Leramo must "go beyond the pleadings ...[to] designate specific facts showing

15  that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324.  "A disparate treatment plaintiff can

16  survive summary judgment without producing any evidence beyond that constituting his prima facie

17  case, if that evidence raises a general issue of material fact regarding the truth of the employer's

18  proffered reasons." *Chang*, 225 F.3d at 1127 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530

19  U.S. 133 (2000)).  If Dr. Leramo demonstrates through specific evidence that a genuine issue of

20  material fact exists, defendants' summary judgment motion must be denied.

21  Dr. Leramo presents no evidence to support pretext of discrimination based on her gender, race,

22  or national origin.  Dr. Leramo presents no evidence, directly or indirectly, to demonstrate that

23  Premier's proffered explanation for its adverse employment decisions was "unworthy of credence,"

24  other than counsel's characterization of the evidence as "lies."  There is no evidence to support any

25  internal inconsistencies.  Rather, the Premier partnership meeting minutes indicate that for several

26  months they met to discuss a plan of action regarding Dr. Leramo's poor performance.  It was first

27  decided to give a demonstration.  Next, the partners agreed to suggest that Dr. Leramo take time off to

28  pursue more education to improve her skills.  When that offer was not accepted, and with complaints

22

1   mounting during that same time period and for operations outside of OB, the partners agreed not to

2   renew Dr. Leramo's contract.  These actions are consistent with a legitimate business purpose, after

3   giving Dr. Leramo multiple opportunities over a large time period to improve her skills.  Dr. Leramo

4   fails to point to specific facts which tend to show that discrimination was the likely cause of her adverse

5   employment action for each of her claims.  That is, Dr. Leramo carries the burden to specify evidence

6   that tends to show that she was not offered partnership, her hours were reduced, and/or her contract was

7   not renewed *because of* each of her asserted bases of discrimination–gender, race, and national origin.

8   She fails to demonstrate specific facts for any of the asserted bases.  For these reasons, this Court grants

9   summary judgment in favor of defendants on Dr. Leramo's discrimination claims.

10  **Dr. Leramo's Retaliation Claims**

11      Dr. Leramo asserts claims for retaliation in violation of Section 1981, though she also argues

12  retaliation pursuant to Title VII or FEHA.  To establish a prima facie case of retaliation under state and

13  federal law, Dr. Leramo must prove that: (1) she engaged in a protected activity; (2) she suffered an

14  adverse employment action; and (3) a causal link existed between the protected activity and the adverse

15  employment action. *Cohen v. Fred Meyer*, *Inc.*, 686 F.2d 793, 796 (9th Cir. 1982) (Title VII); *Morgan*

16  *v. Regents of Univ. of Cal*., 88 Cal. App. 4th 52, 69 (2000) (FEHA).

17      Based on these standards, Dr. Leramo must establish that she suffered an adverse employment

18  action that was caused by a "statutorily protected expression." *E.E.O.C. v. Crown Zellerbach Corp*.,

19  720 F.2d 1008, 1012 (9th Cir. 1983).  The "protected activity" in a retaliation case refers to an

20  employee's statement that is "opposed to an unlawful employment practice." *Id*.  Here, the undisputed

21  evidence establishes that the only "protected activity" that Dr. Leramo engaged in was the complaint

22  regarding Dr. Wagner's comment.  Dr. Leramo did not make any other complaints of harassment to

23  Premier and did not file any claims against Premier until after her contract was not renewed.

24      Dr. Leramo complained to Premier when Dr. Wagner made the following comment: "Come on

25  in if you want to get raped."  She also perceived this comment to be harassment.  She complained about

26  that comment when it occurred in April 2007.  Dr. Leramo argues that she was retaliated against for

27  complaining about this comment because (1) her hours were reduced about two weeks after

28  complaining about the comment in April 2007; (2) Premier refused to make her a partner in December

1    2007; and (3) Premier refused to renew her contract in June 2008.

2         Defendants argue that there is no causal link between the adverse employment actions and the

3    protected activities.  Based on the undisputed evidence, Dr. Leramo fails to establish a causal link

4    between the decision to reduce her hours and the protected activity.  Here, there is evidence that in

5    January 2007, the partners agreed to encourage Dr. Leramo to take a one-year fellowship.  When she

6    refused, the partners agreed on March 6, 2007, to remove Dr. Leramo from the OB on-call list.  This

7    March 6, 2007 decision was to become effective on April 16, 2007.  Thus, the decision to remove her

8    from the OB call list was made *before* the protected activity occurred in early April 2007.  Because the

9    decision was to remove her from the OB on call list was made before she complained about the

10   comment, there is no causal link between the protected activity and the adverse employment action.

11        Dr. Leramo also fails to establish a causal link between her complaint and Premier's December

12   2007 decision not to make her partner and the June 2008 decision not to renew her contract.  In these

13   circumstances, the Court considers temporal proximity between the protected activity and the adverse

14   employment action.  The proximity in time between the two must be "very close" to support an

15   inference that the adverse employment action was caused by the protected activity.  *Clark County Sch.*

16   *Dist. v. Breeden*, 522 U.S. 268, 274 (2001) (discussing three and four months as too long to establish

17   a causal connection); *Manatt,* 339 F.3d at 802 (nine months between plaintiff's complaint and adverse

18   decision too long to satisfy causation prong for Section 1981 retaliation claim).  Dr. Leramo offers no

19   serious opposition to this argument and no evidence to connect the actions with her complaint

20   temporally or otherwise.  Accordingly, summary adjudication is granted in favor of defendants on Dr.

21   Leramo's retaliation claims.

22                           **Dr. Leramo's Unruh Act Claim**

23        In her fifth cause of action, Dr. Leramo asserts a claim pursuant to California's Unruh Act, Civil

24   Code § 51.5.  Pursuant to Cal. Civ. Code §51.5 (a) ("Section 51.5"): "No business establishment of any

25   kind...shall discriminate against...any person in this state on account of [race, national origin, or sex][.]"

26   Defendants argue that Dr. Leramo's Unruh Act claim fails as a matter of law.

27        The "California Supreme Court has expressly held that employment discrimination claims are

28   excluded from §51's protection." *Johnson v. Riverside Healthcare Sys.*, 534 F.3d 1116, 1124 (9th Cir.

                                          24

2008) (en banc) (citing *Alcorn v. Anbro Eng'g, Inc.*, 2 Cal. 3d 493, 500 (1970)).  Defendants argue that the Unruh Act claim fails as a matter of law because Section 51.5 "is aimed only at discrimination in relationships similar to the proprietor/customer relationship." *Johnson*, 534 F.3d at 1126-27 (internal quotations omitted).   In *Johnson*, the court concluded that a plaintiff must establish a customer-proprietor relationship to establish an Unruh Act claim pursuant to Section 51.5. *Id*. at 1127.

This Court is bound to follow the Ninth Circuit precedent as set forth in *Johnson* and *Strother v. Southern California Permanente Medical Group*, 79 F.3d 859 (9th Cir. 1996).  The circumstances in this action are similar to those in *Strother* and *Johnson*; namely, a physician is suing her medical group, rather than a hospital, and questions of fact remain as to whether Dr. Leramo was an employee who is entitled to FEHA protection or an independent contractor to preclude FEHA protection.[6]  Based on the evidence in the record, defendants establish that the relationship between Dr. Leramo and Premier is more similar to an employment relationship than that of a proprietor-customer relationship. Pursuant to this authority, defendants need not establish an employer-employee relationship conclusively.  Rather, an Unruh Act claim is precluded so long as the relationship is "similar" to an employment relationship.  In addition, an Unruh Act claim is applicable only when the relationship between the parties is similar to a proprietor-customer relationship.  Based on these binding authorities and the evidence presented, Dr. Leramo's Unruh Act claim fails as a matter of law.

Despite this conclusion, this Court notes that there is a tension and apparent conflict between federal and state law on this state law issue.  The Ninth Circuit rulings in *Strother* and *Johnson* appear inconsistent with *Payne v. Anaheim Mem. Medical Center, Inc*., 130 Cal. App. 4th. 729, 747 (2005) and other applicable California cases.

It is not clear in the Ninth Circuit's conclusion's how the Unruh Act limits claims to a proprietor-customer relationship.  In *Payne,* the California appellate court made clear that the Unruh Act only precludes a claim when an employer-employee relationship is established to provide FEHA protection.  The *Payne* court examined the Ninth Circuit case of *Strother*, which presented issues similar to those presented in the instant case:

---

[6]Although this Court ultimately determined that Dr. Leramo's FEHA claims fails as a matter of law, this Court concluded that factual issues remained regarding her employment status.

In *Strother*, the physician plaintiff was asserting a claim against the medical group for which she worked (and in which she herself was a partner), and not against a hospital. She alleged violations of both FEHA and the [Unruh Act]. After the lower court summarily disposed of all her claims, she appealed, and the court of appeals reversed the judgement with respect to her FEHA claim. The court concluded there were triable issues of fact as to that claim because her status as a partner in the medical group did not necessarily preclude her from also being considered an "employee" for purposes of FEHA protections. Consistent with that analysis, th court then concluded that even if the physician were ultimately determined not to be an "employee," the physician's relationship with her medical group was nonetheless more closely analogous to an employer-employee relationship than it was to a customer-proprietor relationship and was thus not intended to be governed by the [Unruh Act].

*Payne*, 130 Cal. App. 4th at 747-48. Rather than support the *Strother* court's conclusion, the *Payne* court noted:

We do not necessarily agree with the Ninth Circuit's conclusion to the extent it suggests the physician might be ultimately be denied a remedy under either the FEHA or the UCRA. As we have already explained, *Alcorn v. Anbro Engineering, Inc., supra*, 2 Cal.3d 493, made clear that the exclusion of employees from the [Unruh Act] was a direct result of that relationship being expressly governed by the FEHA. If, however, the relationship in *Strother v. Southern California Permanente Medical Group, supra*, 79 F. 3d 859, were ultimately deemed not to be one of employee-employer, then the rationale for excluding it from the [Unruh Act] disappears.

*Id.* at 748 n. 10. Despite this opinion from a California court on California law, the Ninth Circuit continued to opine that the Unruh Act precludes any claims outside of the customer-proprietor relationship. *Johnson*, 534 F.3d at 1126-27.[7]

In interpreting state law, federal courts look to state law. Where, as here, the state's highest court has not spoken on an issue, federal courts undertake to determine "what result the court would reach if we were standing in its shoes by examining 'state appellate court opinions, statutes and treatises.'" *Johnson*, 534 F.3d at 1125. The *Payne* court rejected the Ninth Circuit's narrow view on this issue, and established that California case law construes the Unruh Act liberally, particularly when there is an issue of fact as to whether an employer-employee relationship exists. The court's opinion in *Payne* is persuasive because, "the California Court of Appeal's announcement of a rule of law 'is a datum for ascertaining state law'" which federal courts may not omit unless it is "convinced by other persuasive data that the highest court of the state would decide otherwise." *Johnson*, 534 F.3d at 1125

---

[7]Should this issue be revisited by the Ninth Circuit, this Court urges clarification in this regard.

1    (quoting *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1012-13 (9th Cir. 2004)).  This

2    Court finds no other persuasive authority from California cases that the California Supreme Court

3    would deviate from the opinion espoused in *Payne*.

4         The *Payne* court made clear that employment discrimination claims are excluded from Unruh

5    Act protection only because they are specifically addressed under FEHA, which was passed at the same

6    time as the Unruh Act. 130 Cal. App. 4th. at 747.  Only the "employer-employee relationship" is

7    excluded from the Unruh Act. *Id*.  According to *Payne*, if the employer-employee relationship does not

8    exist (after a factual determination), then "the rational for excluding [the Unruh Act claim] disappears"

9    and an Unruh Act claim may lie. *Id*. at 748 n. 10.  Thus, where questions of fact exist as to the

10   employer-employee relationship, this Court could not conclude (as it was required to conclude here)

11   that an Unruh Act claim fails as a matter of law.

12                      **Dr. Leramo's Cal. Constitution Art. 1, § 8 Claim**

13        Dr. Leramo argues that defendants' violated California Constitution Article 1, section 8.  This

14   section states a "fundamental public policy against racism in private employment and the workplace."

15   *Sistare-Meyer*, 58 Cal. App. 4th at 14.  A plaintiff may bring a claim for wrongful discharge in violation

16   of this public policy pursuant to *Tameny v. Atlantic Richfield Co.*, 27 Cal. 3d 167 (1980). *Id*.

17        Defendants argue that because Dr. Leramo was an independent contractor, this claim is barred

18   as a matter of law.  As set forth above, the California Constitutional claim is limited to employees.

19   Independent contractors are precluded from bringing a claim of discrimination under this authority. *Id*.

20   As more fully discussed above, however, questions of fact remain on the employment relationship

21   between the parties.  Accordingly, summary adjudication cannot be granted on this issue.

22        Defendants further argue that this claim fails because Dr. Leramo fails to demonstrate racial

23   discrimination in the workplace.  In her opposition, Dr. Leramo fails to set forth specific instances of

24   racial discrimination to support this claim.  Indeed, her only argument related to this constitutional

25   claim relates to the employment relationship.  Dr. Leramo fails to oppose defendants' assertion that no

26   evidence supports her claims of discrimination.  Because Dr. Leramo fails to carry her burden to oppose

27   meaningfully this motion, defendants' motion for summary adjudication of this claim is granted.

28   ///

1

**Punitive Damages**

2        Although this Court's rulings have adjudged Dr. Leramo's remaining claims to fail as a matter

3   of law, the Court shall address the remaining issue in the alternative.  Dr. Leramo seeks an award of

4   punitive damages.  Defendants argue that Dr. Leramo is not entitled to punitive damages as a matter

5   of law.

6        To recover punitive damages, Dr. Leramo must establish "through clear and convincing

7   evidence" that defendants acted with "oppression, fraud, or malice."  Cal. Civ. Code § 3294.  "Clear

8   and convincing evidence" is evidence "sufficient to support a finding of high probability."  *Waits v.*

9   *Frito-Lay, Inc.*, 978 F.2d 1093 (9th Cir. 1992).   "The evidence must be so clear as to leave no

10  substantial doubt and sufficiently strong to command the unhesitating assent of every reasonable mind."

11  *Harbison v. American Motorists Ins. Co.*, 636 F. Supp. 2d 1030 (E.D. Cal. 2009).  The "clear and

12  convincing" evidentiary standard for punitive damages under California law applies to every stage of

13  the litigation process, including summary adjudication. *Adams v. Allstate Ins. Co.*, 187 F. Supp. 2d 1219

14  (C.D. Cal. 2002); *Spinks v. Equity Residential Briarwood Apts*., 171 Cal. App. 4th 1004 (2009).

15  "Malice" is defined as "conduct which is intended by the defendant to cause injury to the plaintiff or

16  despicable conduct which is carried on by the defendant with a willful or conscious disregard for the

17  rights and safety of others."  Cal. Civ. Code §3294(c)(1).  "Oppression" is defined as "despicable

18  conduct that subjects a person to cruel and unusual hardship in conscious disregard of that person's

19  rights." Cal. Civ. Code § 3294(c)(2).  "Used in its ordinary sense, the adjective 'despicable' is a

20  powerful term that refers to circumstances that are 'base,' 'vile' or 'contemptible.'" *Shade Foods v.*

21  *Innovative Products Sales & Marketing, Inc.*, 78 Cal. App. 4th 847, 890 (2000).

22       Dr. Leramo fails to carry her burden to establish her demand for punitive damages. The evidence

23  is not "so clear as to leave no substantial doubt" that anyone at Premier acted to cause injury to Dr.

24  Leramo, or acted with a conscious disregard for Dr. Leramo's rights.  When viewed in a light most

25  favorable to Dr. Leramo, the evidence demonstrates that one Premier partner made an inappropriate

26  comment to Dr. Leramo.  The Court cannot find that comment to be the basis for exemplary damages.

27  Under the circumstances of this case, a fact-finder could find reasonably that defendants acted without

28  racial animus and with a non-discriminatory, business purpose to deny Dr. Leramo partnership, to reduce

her hours, and to refuse to renew her contract.  Dr. Leramo fails to raise questions of fact as to her discrimination and retaliation claims and she fails to establish a "high probability" that she will recover on them.  Accordingly, the punitive damages prayer for relief fails as a matter of law.

### CONCLUSION

For the foregoing reasons, the Court GRANTS summary judgment in favor of defendants. The clerk of court is DIRECTED to enter judgment in favor of defendants and against Dr. Leramo on all claims.

IT IS SO ORDERED.

**Dated:    July 8, 2011**                         /s/ Lawrence J. O'Neill
                                                            UNITED STATES DISTRICT JUDGE